UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JEFFREY DZIERBICKI,

        Plaintiff,

v.

        Case Number 07-13109-BC
        Honorable Thomas L. Ludington

TOWNSHIP OF OSCODA, ROBERT
LAVACK, ROBERT F. STALKER, II, ALAN
MACGREGOR, KEVIN KUBIK, KEN
KREINER,

        Defendants.
_____ /

## ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

On July 24, 2007, Plaintiff Jeffrey Dzierbicki filed a complaint alleging six counts against Defendants Oscoda Township, Superintendent Robert F. Stalker, II, and Officers Alan MacGregor, Kevin Kubik, and Ken Kreiner, including (1) retaliation under the First Amendment, (2) violations of substantive due process under the Fourteenth Amendment, (3) violations of substantive due process and right to family privacy and good name under the Fourteenth Amendment, (4) violations of procedural due process under the Fourteenth Amendment, (5) intentional infliction of emotional distress, and (6) gross negligence. At the time of filing the complaint, Plaintiff was employed as a police officer for Oscoda Township. Plaintiff's claims generally arise out of events that occurred throughout the course of his employment.

On December 17, 2008, subsequent to a hearing on a motion for summary judgment filed by Defendants, the Court dismissed all of Plaintiff's claims, except his claim for retaliation under the First Amendment. *See* [Dkt. # 32]. On February 16, 2009, Plaintiff filed a motion to amend his

complaint, which the Court granted on February 26, 2009. Plaintiff filed an amended complaint [Dkt. # 56], which added a claim of retaliation under the First Amendment arising out of Defendants' termination of Plaintiff's employment on August 29, 2008. Now before the Court is Defendants' motion for partial summary judgment [Dkt. # 68], filed on May 26, 2009. Plaintiff filed a response [Dkt. # 72] on June 16, 2009, and Defendants filed a reply [Dkt. # 74] on June 23, 2009.

The Court has reviewed the parties' submissions and finds that the relevant law and facts have been set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Defendant's motion for partial summary judgment will be denied.

I

The Court previously set out a detailed statement of the facts in its order granting in part and denying in part Defendants' motion for summary judgment on December 17, 2008. The facts will be repeated here only to the extent necessary to provide context for Plaintiff's new claim and factual allegations related to his amended complaint.

Plaintiff was employed as a police officer for Oscoda Township since 1997 until the termination of his employment on August 29, 2008. Defendant LaVack is the Chief of Police of Oscoda Township and has been employed by the department since 1974. Defendant Stalker is the superintendent for Oscoda Township, and has had that position since 1991. Defendants Kreiner and Kubik have been employed as police officers by Oscoda Township since 2004 and 2005, respectively. Defendant MacGregor is a sergeant on the police force.

According to Plaintiff, Defendants targeted his daughter, Chelsea Dzierbicki, for traffic

stops. On one particular occasion, on October 30, 2005, Defendant Kubik stopped Chelsea while she was driving back from a Halloween party with a friend in her vehicle. Ultimately, Defendant Kubik arrested Chelsea for operating while under the influence of alcohol and transported her to the Iosco County Jail. When Defendant Kubik arrived with Chelsea at the jail, he made several inappropriate sexual comments to Corrections Officer Patrick Robson about Chelsea, of which Plaintiff eventually learned. In the days following the stop, Plaintiff expressed some concerns about Chelsea's arrest to Defendant LaVack. Defendant LaVack testified that he was not informed by either Plaintiff or Officer Robson about Defendant Kubik's sexual comments at the jail, however, Defendant LaVack admitted that he had concerns regarding certain procedures that had not been followed during the traffic stop.

Based on his belief that certain officers were targeting Chelsea, Plaintiff drove Chelsea's car into town on February 18, 2006. Arguably, Plaintiff was testing the officers on duty that night, to see if they would pull him over simply because he was driving his daughter's car. Eventually, Defendant Kubik pulled Plaintiff over based on alleged traffic violations, although Plaintiff contends that he did not violate any traffic laws. According to Plaintiff, Defendant Kubik was surprised to find that Chelsea was not the driver of the car. According to Defendants, Plaintiff immediately became verbally combative and profane with Defendant Kubik. At Plaintiff's request, Sergeant Curtis Hall, as Defendant Kubik's supervisor, was called to the scene; Plaintiff told Sergeant Hall that Defendant Kubik had been targeting Chelsea.

On March 11, 2006, Plaintiff submitted a written statement to Sergeant Hall and Defendant LaVack, which expressed his concerns regarding the targeting of Chelsea and further alleged that citizens had complained to him that the midnight shift was too aggressive when it consisted of

Defendants Kubik and Kreiner. Plaintiff also expressed his concerns to Defendant LaVack personally, and Defendant LaVack admittedly responded, "no worries because no one is going to lose their jobs over this." On March 23, 2006, Plaintiff was provided with written notice of the charges against him concerning the February 18, 2006, traffic stop, and their bases; the notice further indicated Defendants' intent to suspend Plaintiff for eight weeks without pay. Subsequent to a hearing, Plaintiff was suspended for six weeks without pay.

When Plaintiff returned to work, Defendant LaVack assigned him to work the midnight shift, causing him to have to work with Defendants Kubik and Kreiner. Due to the heightened emotional stress and anxiety of working with Defendants Kubik and Kreiner, Plaintiff went on medical leave from May 19, 2006, through early August 2006. At the time, Defendant Stalker requested a second opinion regarding Plaintiff's need for sick leave, which resulted in Plaintiff meeting with a psychologist. During the interview with the psychologist, Plaintiff made threatening comments toward his coworkers, including threats of physical harm. As a result, Plaintiff was required to attend four anger management courses.

On August 20, 2006, a couple of days after Plaintiff returned to work, Defendant Kubik and Plaintiff were dispatched on a domestic violence call. According to Plaintiff, he immediately responded to the call, but while he was en route, he noticed a male running away from the scene and stopped the man because he suspected the man may have been involved. After clearing the man, Plaintiff arrived at the scene seven minutes after he had been dispatched. Defendant Kubik wrote a letter to Defendant LaVack criticizing Plaintiff's response time. Defendant LaVack issued Plaintiff a "written, verbal reprimand," which pursuant to department policy, did not become part of Plaintiff's file. According to Defendant LaVack, he determined that Plaintiff had been closer to

the incident than Defendant Kubik, and that Plaintiff's slow response time had endangered Defendant Kubik. According to Defendant LaVack, no other officers have ever received a written, verbal warning based on a lengthy response time. According to Plaintiff, another officer was not disciplined even though he responded to a similar call twenty minutes after he was dispatched. However, Defendant LaVack testified that the officer in that incident had not been assigned to the call.

On November 16, 2006, Plaintiff wrote a letter to Sergeant Mark David, the supervising officer on duty, alleging that Defendant Kubik had slammed a door into Plaintiff's back while Plaintiff was on duty, and that Defendant Kubik responded to the incident by saying, "you shouldn't be standing by a door." According to Plaintiff, he was asked to write the letter after Defendant Kubik wrote a letter to Defendant LaVack memorializing the incident, asserting that he was doing so in case Plaintiff attempted to lie about it. As a result of the incident, an internal investigation was conducted, and Plaintiff attended a hearing. Plaintiff was provided with written notice of the charges and their bases; the notice also indicated Defendants' intent to suspend Plaintiff for four days without pay. Ultimately, Plaintiff was suspended for four days without pay, allegedly because his allegations against Defendant Kubik were found to be untruthful. No witnesses corroborated that Defendant Kubik had forcefully slammed the door into Plaintiff's back. Officer Michael Hearn testified that he felt that the discipline was unfair.

In December 2006, Plaintiff received a verbal, written warning for his failure to meet the department's required number of traffic stops that month. Plaintiff made only nineteen traffic stops, when he should have made 19.5, or twenty. Allegedly, Plaintiff has subsequently been the butt of practical jokes around the department. For example, his squad car has been parked so close to the

evidence trailer that he could not enter it through the driver's side door, and the lights were shut off in the locker room while he was in it.

Ultimately, Defendants terminated Plaintiff's employment on August 29, 2008. The incident purportedly giving rise to the termination involved Plaintiff's delayed response to a dispatch call in the early morning hours of July 28, 2008. Defendant had begun his shift at 6:00 p.m. on July 27, 2008, and was scheduled to complete his shift at 6:00 a.m. on July 28, 2008. Plaintiff was assigned to police vehicle A8 and Officer Dan Rousseau was his partner for the shift.

At 4:22 a.m. on July 28, 2008, Iosco County Central Dispatch Operator Tracy Harp received a call of a breaking and entering in progress at a local party store. She immediately dispatched Plaintiff, who did not respond to her call. Officer Rousseau overheard the dispatch from the police station and immediately responded to the scene. Over the next forty-five minutes, dispatcher Harp tried seven more times to contact Plaintiff without success. Eventually, Harp dispatched an Alcona Country Sheriff Deputy to assist Officer Rousseau. On her eighth or ninth attempt, just after five o'clock in the morning, Harp successfully contacted Plaintiff. When Plaintiff arrived at the scene, he stated to Officer Rousseau that he had not heard the dispatch calls.

Plaintiff testified that he did not report the apparent radio problem to management because they were already aware of problems. Plaintiff testified that he had previously experienced reception problems in vehicle A8, and also in vehicle A3, which he used more regularly. Plaintiff testified that he sometimes only received part of a message and that there are "black hole" areas where no messages can be received.

Dispatcher Harp wrote a memorandum to her supervisor, expressing her concerns about the incident:

> I am not sure if this was another radio problem or if it was something else . . . either way, it really needs to be looked into. This is a HUGE officer safety issue!!! I did not have the opportunity to speak with Officer Dzierbicki about this, however, I spoke briefly with Officer Rousseau and he said that it was most likely another radio glitch. We should definitely take this seriously – not only was an officer's safety possibly in jeopardy, but Officer Dzierbicki could have been on scene in probably less than a minute.

Def. Br. Ex. 4 (ellipses in original). Harp also expressed her concern to Defendant Kreiner, to whom she is engaged to be married. In turn, Defendant Kreiner expressed Harp's concerns to Defendant MacGregor on July 30, 2008. Defendant MacGregor then informed Defendant LaVack. Defendant LaVack commissioned an internal investigation by the shift commanders, Sergeant David, Sergeant Hall, and Defendant MacGregor.

On August 13, 2008, Sergeant David requested written explanations of the activities on Plaintiff's log. Def. Br. Ex. 12. Plaintiff's activity log reflects that Plaintiff began his shift on July 27, 2008, at 6:00 p.m. Def. Br. Ex. 9. The log reflects that Plaintiff performed various duties from 6:00 p.m. until midnight. From midnight until 3:00 a.m., Plaintiff's log reflects that he performed "general patrol." From 3:00 to 3:10 a.m., Plaintiff's log reflects that he was at McDonald's. From 3:10 to 5:30 a.m., Plaintiff's log reflects that he performed "general patrol." From 5:30 to 6:00 a.m. Plaintiff's log reflects that he was at the station.

In his written statement to Sergeant David, Plaintiff explained that he had been patrolling "the area of F-41 corridor." Plaintiff stated that he conducted stationary radar and reviewed materials for an upcoming case. Plaintiff stated that he exited his police cruiser at approximately 4:15 a.m. to stretch his legs and use the bathroom. He also drank some water and ate some fruit. He stated that when he exited the vehicle, he turned on his prep radio. He approximated that he was outside his vehicle for forty to fifty minutes. Plaintiff stated that he was in the police department parking lot at approximately 5:00 a.m. when he received the call from central dispatch.

Plaintiff's deposition testimony is generally consistent with his written statement. Plaintiff testified that he used the term "general patrol" to include a variety of activities, including, "patrolling a certain area, . . . sitting stationary, . . . doing reports, . . . reviews of reports, . . . pretty much anything." Plaintiff testified that in the early morning hours of July 28, 2008, he was parked at a "grassy knoll," where he was watching the entrance and exit to a campground. Plaintiff also testified that he was reviewing documents for a case the next day. Several officers testified that it was common for officers to run stationary radar and to review documents while working their shifts. Several other officers also testified that it was not unusual for there to not be any radio traffic for several hours on the midnight shift.

Defendants emphasize that Plaintiff's testimony was inconsistent with regard to his trip to McDonald's. On the first day of his deposition, Plaintiff basically confirmed the information on his activity log, that he was at McDonald's from approximately 3:00 to 3:10 a.m. On the second day of his deposition, Plaintiff testified that his log must have been inaccurate and that he must have gone to McDonald's closer to 2:00 a.m. Plaintiff testified that he was filling out his log at the end of a long shift and made a mistake transposing his notes onto the log.

Sergeant David obtained a printout produced by the Automated Vehicle Locator ("AVL") contained in vehicle A8 during Plaintiff's shift. The AVL uses global positioning to establish by latitude and longitude the precise location of the vehicle at short intervals, allowing central dispatch to monitor the whereabouts of patrol vehicles. Sergeant David and Defendant MacGregor forwarded the printout to a representative of the firm that sold and serviced the AVLs for Oscoda Township. Defendant MacGregor testified that the representative told him that the printout indicated that vehicle A8 had been stationary from 1:49 to 4:54 a.m.

Sergeant David then located the stationary spot using the latitude-longitude coordinates from the AVL printout. Sergeant David testified that from that location, "if you were sitting there, there is nothing to be seen basically from that location other than woods and field. It's not an area where you would work stationary radar." *See* Def. Br. Ex. 15 (photograph of location identified by Defendants). Sergeant David testified that he saw tire tracks leading to the stationary spot. Defendant MacGregor testified that the tire tracks appeared to be "fresh."

According to Defendants, the spot that Plaintiff alleges that he was conducting "stationary radar" is 333 feet from the location identified by the AVL in vehicle A8. *See* Def. Br. Ex. 8 (Plaintiff's description of the location). Defendant emphasizes that the product literature indicates that the AVL unit is accurate to a position within fifty feet. Defendants represent that Sergeant David testified that he consistently verified the location of the stationary spot to within a few feet by using vehicles A4, A6, A8, and his personal handheld GPS device.[1] Defendants emphasize that Plaintiff testified that "stationary radar" could mean observing vehicles without the actual use of any "radar."

Defendants represent that Officer Hearn and Officer Andy Philpott used vehicle A8 during the two shifts following Plaintiff's. On August 15, 2008, Officer Hearn provided a statement that he did not recall any radio problems on his July 28, 2008, 6:00 a.m. shift. The same day, Officer Philpott provided a statement that he had "clear mobile radio traffic throughout the whole shift," beginning at 2:00 p.m. on July 28, 2008. Officer Philpott also stated that he had never had problems with the mobile radio in vehicle A8.

---

[1] Defendants cite the Court to pages 42 through 47 of Sergeant David's deposition testimony, however, they did not provide pages 46 and 47 to the Court.

Defendants provide an affidavit of service technician Edgar Bringman, stating that he had been at the Oscoda Police Department on July 28, 2008, after Plaintiff's shift ended. Bringman further states that he had been asked by an officer, whose name he did not recall, to check the mobile radio in A8, which he did, and found no problems.

Defendant LaVack testified that there had been transmission problems with the mobile radios when they were installed in the vehicles several years ago along with a new 800 megahertz system. He also testified that there had been reception problems with the prep radios, which are worn on an officer's belt, but those had also been resolved. Dispatcher Harp testified that she had never had anyone tell her that they had not received a dispatch call, unless they were indoors, although she had been told at times that her calls were unintelligible or "digitized."

Officer Dan Wilkins testified that he had experienced problems with transmission and reception, although he could not specifically recall any particular reception issue in any car. Officer Hearn testified that he recalled experiencing problems with transmission and reception, primarily with reception on the prep radios, and more frequently before the "bugs" were worked out of the 800 megahertz system. Officer Hearn testified that there have been times when he had to respond to a dangerous call alone because another officer did not timely respond. Although Officer Hearn could not recall any specific incidents, he indicated that to his knowledge, no other officers had been disciplined on that basis.

Officer Rousseau described the radio problem as "not being able to transmit, sometimes not being able to receive." Officer Rousseau also testified that he had recently transmitted a call, which another officer claimed to have not heard. He further testified that he had missed calls in the last couple of years from other officers.

Plaintiff testified that if there was an error or mistake on an officer's log, "you would get sometimes what some of the guys call nasty grams, a reminder to correct your log." Plaintiff also testified that he thought that he had activated his in car camera throughout his shift. Other officers' testimony indicates that they have not activated the in car camera, but have not been disciplined on that basis.

In mid-August, Defendant LaVack reviewed the results of the internal investigation and consulted with Sergeant David, Sergeant Hall, and Defendant MacGregor. Defendant LaVack testified that each officer agreed that the information obtained described misconduct warranting discharge. On August 16, 2008, Defendant LaVack recommended termination in the form of a "Notice of Disciplinary Action." Def. Br. Ex. 21. The notice described dispatcher Harp's attempts to contact Plaintiff, Officer Rousseau's response to a call without Plaintiff as back up, the AVL records indicating that Plaintiff's vehicle was stationary for approximately three hours until 4:54 a.m., and the apparent inaccuracies on Plaintiff's log related to his notation that he was on "general patrol" during the relevant time.

The notice indicated that Plaintiff's conduct violated certain "Reasons for Disciplinary Action" promulgated by the Oscoda Township Police Department, including the following: (1) neglect of, or inattention to duty; (2) not properly performing police duties; (3) making a false statement, or falsifying any written or verbal report made to a superior officer . . . ; (4) not patrolling, or not properly patrolling the assigned patrol area; (5) inattentiveness to work . . . ; and (6) violating a safety rule or safety practice.

Plaintiff received the notice on August 16, 2008. The notice offered Plaintiff a pre-termination hearing set for August 20, 2008. On the date the hearing was scheduled, Plaintiff

waived his right to the hearing. Plaintiff testified that he waived his right to the hearing because he "was not going to have proper representation through the union." Plaintiff explained that his local union representative was Defendant Kreiner. While Defendant Kreiner had apparently arranged for a substitute representative, on the day of the scheduled hearing, Plaintiff was informed the substitute was unavailable and Defendant Kreiner would represent him. At that point, Plaintiff agreed to waive his right to the hearing because he did not have any faith in Defendant Kreiner's representation of him. Plaintiff testified that he did not believe he could have gotten an adjournment.

Township Supervisor Robert Huebel reviewed the investigatory materials, and on August 26, 2008, sent a memorandum to Defendant Stalker concluding that "the recommended termination of employment is just and appropriate in this case." Def. Br. Ex. 25. Supervisor Huebel concluded that Plaintiff's explanation that he was conducting stationary radar for the three hours leading up to 4:54 a.m. was "incredible in view of the location of his patrol vehicle on our GPS/AVL system." Huebel further concluded that Plaintiff falsified his duty log when he wrote that he went to McDonald's during the time period in which the AVL data indicated that his vehicle was stationary. Huebel also noted that Plaintiff's log did not reflect his eventual response to the breaking and entering, nor a later response at 5:50 a.m. to a private property damage accident. Huebel noted that Plaintiff had not used the in car video camera throughout the shift when he should have. Huebel also indicated that he gave consideration to Plaintiff's "untimely response to a domestic assault on August 20, 2006 and an incident involving [Defendant] Kubik and [Plaintiff] that occurred on November 16, 2006."

On August 29, 2008, Defendant Stalker sent Plaintiff a notice of termination, which was to be effective on that date. Def. Br. Ex. 26. Defendant Stalker indicated that he relied on Supervisor

Huebel's memorandum and his own review of the facts and penalty. When asked to explain his position at his deposition, Defendant Stalker explained, "Well, there was a series of things again, probably most importantly putting a fellow officer in a very compromising and dangerous position, effectively dereliction of duty in terms of the patrol car not moving for three hours and a series of obvious violations of the police department's rules and regulations involving a number of incidents . . . not calling out, not using the camera, et cetera, and then the - - from my perspective pretty obvious misleading information on his log and in his statements."

Defendant Stalker also testified that even if the "door closing incident" and Plaintiff's late response to a call in August 2006 were not considered, he still would have recommended termination of Plaintiff's employment based on the "totality of the circumstances" described in Supervisor Huebel's memorandum. In contrast, Defendant LaVack testified that he would "probably not" have recommended termination of Plaintiff's employment had those two incidents not been considered.

Plaintiff did not file a grievance with the union based on the termination of his employment.

II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the

-13-

outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895

(6th Cir. 1991).

### III

Plaintiff's amended complaint alleges an additional claim of retaliation under the First Amendment, pursuant to 42 U.S.C. § 1983. Under 42 U.S.C. § 1983, an individual may bring a private right of action against anyone, who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot*, 448 U.S. 1 (1980). Generally, to survive summary judgment in a § 1983 action, the plaintiff must demonstrate a genuine issue of material fact as to two elements: (1) the challenged conduct was committed by a person acting under the color of state law and (2) the conduct caused a deprivation of the plaintiff's rights or privileges protected by the laws or Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Baker v. McCollan*, 443 U.S. 137, 142 (1979); *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995).

To succeed on a claim of retaliation under the First Amendment, a plaintiff must show that "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by [his] protected conduct." *Scarborough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (internal citation omitted). *See also Connick v. Meyers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968).

Defendants raise three main arguments to support their motion for summary judgment on Plaintiff's first amendment retaliation claim arising out of the termination of his employment. First, Defendants contend that the Court lacks jurisdiction over Plaintiff's claim because Plaintiff did not

exhaust union grievance procedures. Defendants characterize Plaintiff's claim as alleging that Defendants breached the collective bargaining agreement by wrongfully terminating Plaintiff's employment. Defendants rely on *Rogers v. Board of Education of Buena Vista Schools*, 2 F.3d 163 (6th Cir. 1993), for the proposition that exhaustion of internal union remedies is generally required before a union member can sue his employer for breach of a collective bargaining agreement, and that such a requirement is jurisdictional.

In response, Plaintiff contends that he is not required to exhaust grievance procedures because he is not alleging that Defendants breached the collective bargaining agreement. Plaintiff characterizes his claim solely as unlawful retaliation under the First Amendment. While Plaintiff highlights facts that he believes demonstrate that Defendants used the July 28, 2008, incident as pretext to terminate his employment, reliance on these facts, which could also support a claim for breach of the collective bargaining agreement, does not transform Plaintiff's First Amendment claim into one for breach of the collective bargaining agreement. Indeed, Defendants cite no authority for the proposition that a plaintiff must exhaust internal grievance procedures before bringing claims for constitutional violations in a civil suit. Thus, Defendants are not entitled to summary judgment on this ground.

Second, Defendants contend that Plaintiff's filing of his original complaint did not raise an issue of public concern such that his speech is constitutionally protected. Defendants contend that the complaint was "merely a recitation of speech he already made and was repeated in that particular format for reasons personal to [Plaintiff]." For reasons stated in the Court's earlier opinion, the Court determined that Plaintiff's alleged statements regarding the treatment of Chelsea during the traffic stop and the alleged sexual harassment of Chelsea are constitutionally protected speech. The

-16-

Court also determined that Plaintiff's alleged statements regarding selective enforcement of the law by certain officers are constitutionally protected speech. Defendants do not explain how Plaintiff's complaint does not relate to a matter of public concern given these findings. *See, e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 813 (6th Cir. 2001) (finding that "the Complaint related to sexual harassment and therefore involves a matter of public import"). Thus, Defendants are not entitled to summary judgment on this ground.

Third, Defendants contend that Plaintiff cannot establish a causal connection between the filing of his complaint and termination of his employment as required by § 1983 and First Amendment jurisprudence. Defendants emphasize that Plaintiff must "point to specific, nonconclusory allegations reasonably linking [the] speech to employer discipline." *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002) (abrogated on other grounds) (quoting *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997)). "The fact that an adverse employment action occurred after the exercise of free speech, without more, is insufficient to establish the link that is central to a First Amendment retaliation claim." *Id.* "If the employee meets this burden, the onus then shifts to the employer to show by a preponderance of the evidence that it would have taken the same action absent the protected speech." *Bailey*, 106 F.3d at 144 n.5 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287(1977)). Defendants emphasize the fact that Plaintiff's complaint was filed in July 2007, but Defendants did not terminate Plaintiff's employment until over a year later, in August 2008. Defendants also emphasize that the events of July 28, 2008, provide a legitimate non-discriminatory reason for their actions.

However, Plaintiff has advanced sufficient evidence to raise a genuine issue of material fact as to causation. For example, it is not insignificant that Defendant MacGregor was one of the three

officers who investigated the July 28, 2008, incident. Another one of the three investigating officers, Sergeant Hall, was a named Defendant in a related lawsuit previously brought by Plaintiff's daughter. As Plaintiff emphasizes, while the investigating officers put much effort into identifying his exact location in the early morning hours of July 28, 2008, and evaluating the accuracy of his activity log, the investigating officers did not attempt to verify whether there was a "black hole" for receiving messages in that location. This is significant when both dispatcher Harp and Officer Rousseau had suggested that Plaintiff's failure to respond was likely due to a radio problem, testimony of various officers established that there have historically been problems with transmitting and receiving messages on the prep and mobile radios, and other officers have failed to receive and respond to dispatch calls, but did not have their employment terminated or receive other discipline.

In light of this evidence, Plaintiff has raised a genuine issue of material fact as to whether the filing of the complaint in this lawsuit motivated Defendants to terminate his employment. For this reason, and the reasons previously stated above, Defendants' motion for partial summary judgment will be denied.

IV

Accordingly, it is **ORDERED** that Defendants' motion for partial summary judgment [Dkt. # 68] is **DENIED**.

                                                s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

Dated: August 7, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 7, 2009.

        s/Tracy A. Jacobs  
        TRACY A. JACOBS